***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and oral arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence. The Full Commission reverses the Deputy Commissioner's Opinion and Award and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are properly before the Industrial Commission and the Commission has jurisdiction of the parties and of the subject matter.
2. An employer/employee relationship existed between plaintiff and employer on October 12, 2001 and October 15, 2001.
3. PHICO was the workers' compensation carrier on October 12, 2001 and October 15, 2001 but subsequent to that date PHICO became insolvent and was placed into liquidation by order of the Commonwealth Court of Pennsylvania, and the South Carolina Property and Casualty Insurance Guaranty Association became involved in this claim.
4. This is a claim for an alleged injury by accident to plaintiff's left arm.
5. Plaintiff's average weekly wage is $1,033.76, which yields the maximum compensation rate for 2001.
6. The following exhibits were stipulated into evidence:
a. Stipulated Exhibit 1 — plaintiff's medical records;
b. Stipulated Exhibit 2 — plaintiff's application for long-term disability;
c. Stipulated Exhibit 3 — plaintiff's employment file;
d. Stipulated Exhibit 4 — Industrial Commission forms;
e. Stipulated Exhibit 5 — PHICO documents;
7. The following exhibits were admitted into evidence at the Deputy Commissioner's hearing:
a. Defendants' Exhibit 1 — plaintiff's answers to interrogatories;
b. Defendants' Exhibit 2 — plaintiff's job application;
c. Defendants' Exhibit 3 — new associate general orientation form;
d. Defendants' Exhibits 4 and 5 — defendant-employer's policies and procedures;
e. Defendants' Exhibit 6 — employee counseling report;
f. Defendants' Exhibit 7 — accident and disability claim form;
g. Defendants' Exhibit 8 — long-term disability form;
h. Defendants' Exhibit 9 — statement from Vicki Blount;
i. Defendants' Exhibit 10 — defendant-employer's visit record history.
 ***********
The Full Commission rejects the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. As of the hearing before the Deputy Commissioner, plaintiff was 53 years old. She is a college graduate and has been a registered nurse for 30 years. In October 2000, plaintiff began employment with defendant-employer as a nurse in the progressive medical care unit. Prior to that time, plaintiff worked at several other hospitals as a patient care nurse.
2. On October 12, 2001, plaintiff was injured while repositioning a patient. Because the hospital was understaffed, she had no one to assist her in what was normally a two-person maneuver to pull a patient up in bed. Therefore, plaintiff moved the patient by herself, which meant that she had to position her body differently than she normally would, by standing closer to the patient and to the head of the bed. This particular patient was heavy, non-ambulatory, and unable to assist plaintiff with the move. Plaintiff had to use more force with her arms and legs than usual. As she moved the patient, plaintiff felt a sharp pain underneath her left armpit and in her breast area.
3. Soon after the lifting incident, plaintiff's left arm began swelling into her wrist and fingers. Sue Parent, another nurse on the floor, saw plaintiff's swollen left arm and recalled that plaintiff said she injured the arm pulling a patient. Ms. Parent also testified that the following night plaintiff's left arm was swollen to twice the normal size and was dark red. Plaintiff's supervisor did not recall whether plaintiff reported the left arm injury on October 12, 2001. Plaintiff continued to work the rest of her shift and took Ibuprofen to try to reduce the pain and swelling. Plaintiff also worked the following two nights. During the shift on October 13, 2001, plaintiff went with Monica Miller, the shift supervisor, to the Emergency Room where a doctor offered to give plaintiff Lortab, a prescription painkiller that plaintiff declined to take while working.
4. Plaintiff worked on October 14, 2001, and late that night or early the next morning of October 15, 2001, a "coded" patient was identified on the unit and all nurses were required to respond. While responding, plaintiff shoved a bed to get the crash cart closer to the bed and felt severe, sharp, stabbing pain in her arm. Plaintiff completed her shift and was off work for the rest of the week, as was her typical pattern.
5. After her shift ended on Monday, October 15, 2001, plaintiff sought treatment from her family physician, Dr. James Currin, who is a board-certified family practitioner. Dr. Currin prescribed Cipro and an anti-inflammatory for the swelling in her arm.
6. During the week plaintiff was not working, the swelling in her arm improved. Plaintiff's next scheduled work shift was on October 19, 2001, and, during the shift, plaintiff's left arm began to hurt and swell again. Plaintiff reported problems with her arm to Gail Peterson, the shift supervisor, and asked to be allowed to go home. Plaintiff did not report a work injury to Ms. Peterson. Ms. Peterson testified that it was her impression that the pain and swelling was a flare-up of plaintiff's pre-existing condition secondary to a prior mastectomy from several years earlier. After looking at plaintiff's arm, Ms. Peterson authorized plaintiff to leave work. Plaintiff has not returned to work in any capacity since October 20, 2001.
7. On October 23, 2001, plaintiff was treated by Dr. Brian Parkes, a general surgeon, who consulted with Dr. Currin concerning plaintiff's left arm condition. Dr. Parkes prescribed Vioxx, instructed plaintiff to elevate her left arm, and took plaintiff out of work through November 23, 2001.
8. On November 19, 2001, plaintiff was evaluated by Dr. Diana McNeill, Associate Professor of Medicine at Duke University Medical Center, who noted plaintiff was having problems with lymphedema after heavy lifting although plaintiff mentioned no specific incident. Dr. McNeill referred plaintiff to a lymphedema clinic.
9. Lymphedema is a disorder caused by the malarrangement of lymphatic flow secondary to an obstruction. This obstruction usually develops after infection, malignancy or the trauma associated with surgery or radiation treatment in the region. The disorder slowly progresses over time until it reaches a point that symptoms become noticeable to the patient. Lymphedema occurs in about 20% of patients who undergo radiation and/or surgery for breast cancer, and typically appears within three to five years. In January 1998, plaintiff had a mastectomy due to breast cancer and her treatment included two surgeries, the removal of lymph nodes and 37 radiation treatments. Following this treatment, plaintiff returned to work as a hospital nurse and had no further problems with her left arm until the October 12, 2001 incident aggravated her condition.
10. On November 21, 2001, plaintiff returned to Dr. Currin, who took her out of work indefinitely due to the swelling in her arm, which he diagnosed as lymphedema. Dr. Currin stated that on a daily basis plaintiff continued to have severe swelling in her arm, which limited her ability to perform even minimal activity. He noted that plaintiff also had daily weakness related to the recurrent pain and swelling.
11. On November 21, 2001, plaintiff was evaluated by Dr. Sebastian Ciacchella at defendant-employer's Occupational Health Services, who also diagnosed plaintiff with lymphedema of the left arm and left arm strain. The history recorded by Dr. Ciacchella notes that plaintiff's left arm pain and swelling began after she lifted a heavy patient. Dr. Ciacchella also took plaintiff out of work.
12. On November 27, 2001, Dr. Parkes observed that plaintiff had developed pitting edema, or swelling, in her left arm after lifting a heavy patient at work. Dr. Parkes noted that plaintiff should file for disability benefits because she was unable to perform any activities involved with working. Thereafter, plaintiff's treatment was provided by Dr. Currin, her family physician.
13. In a letter dated July 17, 2003, Dr. Currin stated that he believed that plaintiff was completely disabled from performing any gainful employment due to chronic lymphedema. Dr. Currin stated that plaintiff experienced worsening and swelling of her left arm after the liftng incident. In his opinion, "the lifting of the patient that occurred on 10/12/01 did aggravate her lymphedema which was . . . preexisting."
14. As of his deposition on August 24, 2005, Dr. Currin had retired from family practice. Dr. Currin reiterated his opinion that the incident at work on October 12, 2001, more likely than not aggravated plaintiff's lymphedema. Dr. Currin believed that because of plaintiff's continued pain and swelling in that arm, she was disabled from any employment beginning October 19, 2001. He knew of no job plaintiff could perform with the daily pain and swelling in her arm, which limits her ability to report for work on a regular basis and to perform the duties that would be expected of her.
15. Susan Evans, benefits coordinator in defendant-employer's human resources department, helped plaintiff apply for short-term and long-term disability benefits at the end of November 2001. After noting that no accident report had been filed at employee health, Ms. Evans provided plaintiff with disability paperwork. Although plaintiff checked the "no" box when asked on the short-term disability application whether her symptoms were the result of an "accident," plaintiff described her condition as beginning after "heavy lifting of patients during work when she felt swelling in her arm." Plaintiff's long-term disability application was similar in that she reported that "lifting of patients and/or equipment during the course of a shift and job performance of her duties as a registered nurse" led to the pain and swelling in her left arm.
16. Vicki Blount, employee health supervisor, testified that she was not notified of any alleged work-related injury until February 4, 2002, when plaintiff called her about completing workers' compensation forms. Ms. Blount completed a Form 19 that day. However, Ms. Blount admitted at the hearing that plaintiff's description of her injury to Dr. Ciacchella on November 21, 2001, sounded like a workers' compensation injury, as did plaintiff's description of the injury on the disability applications.
17. Based upon the greater weight of the evidence, the Full Commission finds that defendant-employer had actual, verbal notice of the injury by accident on October 13, 2001, when plaintiff's supervisor went with her to the Emergency Room and that plaintiff's application for disability benefits provided written notice of the incident on November 27, 2001. Although defendants presented testimony at the Deputy Commissioner's hearing about defendant-employer's policies for reporting injuries on the job, the evidence fails to show by the greater weight that defendants were prejudiced by plaintiff's delay in providing written notice.
18. Dr. George Paschal, III, a general surgeon with Raleigh Surgical Group, was asked by defendants to evaluate plaintiff's condition after reviewing her medical records. He did not actually see or treat plaintiff. Approximately 50% of Dr. Paschal's practice involves malignant disease and he is familiar with the diagnosis and treatment of lymphedema. Dr. Paschal testified that it normally takes three to five years after radiation and/or surgery for a breast cancer patient to develop lymphedema. In this case, Dr. Paschal felt that when plaintiff performed the activities on October 12, 2001, the lymphatic flow was curtailed sufficiently to bring her condition to her attention. Although Dr. Paschal did not think that the lifting incident caused or materially aggravated the lymphedema, he believed that there was "no question" that the October 12, 2001 lifting incident aggravated plaintiff's left arm condition. Additionally, Dr. Paschal stated that plaintiff's left arm lymphedema might not have become symptomatic but for the October 12, 2001 lifting incident. Dr. Paschal indicated that it was extremely unusual for a lymphedema patient to be totally unable to work in any employment.
19. Bernard Moore, certified vocational counselor, performed a vocational assessment based upon plaintiff's medical, work and educational history and obtained a labor market survey. Mr. Moore was instructed by defendants to assume that plaintiff had been released to sedentary employment, although no treating physician has released plaintiff to sedentary work. Taking plaintiff's transferable skills and physical limitations into account, Mr. Moore identified six job titles that are appropriate for her capacity. Mr. Moore testified that plaintiff would be able to locate suitable employment in her local job market if she conducted a reasonable job search. Mr. Moore did not feel that a job search would be futile and he indicated plaintiff is a good candidate for vocational rehabilitation.
20. The Commission gives greater weight to the expert medical opinions of Dr. Currin, plaintiff's treating physician, than to Dr. Paschal who never saw or treated plaintiff.
21. Plaintiff has not worked since October 20, 2001, and has not looked for other employment.
22. As of the hearing before the Deputy Commissioner, plaintiff's left arm remained painful and swollen. She continues to experience numbness and tingling in her arm. She has pain and swelling 24 hours a day. To keep the swelling down, plaintiff wears a sling at all times except when showering and sleeping. She is unable to use the left arm at all. Because nursing requires use of both arms, plaintiff does not feel that she is physically able to return to work as a nurse.
23. The Full Commission finds plaintiff credible as to the incidents on October 12 and 15, 2001 and as to the extent of her disability. Based on the greater weight of the evidence, the Full Commission finds that on October 12, 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendants when she injured her left arm and significantly aggravated her pre-existing but asymptomatic lymphedema. Plaintiff's moving a heavy, non-ambulatory patient by herself with no assistance from a co-worker, having to position herself differently than normal, and using additional force in order to move the patient constituted an unlooked for and untoward event, which was an interruption of plaintiff's normal work routine.
24. The Commission further finds that as a result of the compensable injury by accident plaintiff was totally disabled from any employment beginning October 23, 2001, and continuing to the present. Although Mr. Moore believed that plaintiff was capable of sedentary employment, no treating physician has released plaintiff to sedentary work.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. An injury by accident is defined under the Act as an unlooked for and untoward event, which is not expected or designed by the injured employee. N.C. Gen. Stat. § 97-2(6); Adams v. Burlington Industries,61 N.C. App. 258, 300 S.E.2d 455 (1983). In this case plaintiff's lifting activities on October 12, 2001, constituted an interruption of her work routine and introduced unusual conditions resulting in unexpected consequences. Calderwood v. Charlotte-Mecklenburg Hosp.Auth., 135 N.C. App. 112, 519 S.E.2d 61 (1999), disc. review denied,351 N.C. 351, 543 S.E.2d 124 (2000). The lifting incident combined with and significantly aggravated her pre-existing lymphedema to produce the injury by accident. Mills v. City of New Bern, 122 N.C. App. 283,468 S.E.2d 587 (1996). Therefore, on October 12, 2001, plaintiff sustained an injury by accident arising out of and in the course of her employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. Defendants had actual notice of plaintiff's injury by accident and were not prejudiced by any delay in filing a written report of injury. Therefore, plaintiff is entitled to receive benefits under the Workers' Compensation Act for the injury in question. N.C. Gen. Stat. § 97-22.
3. Because plaintiff's claim was denied, plaintiff has the burden of proving disability, defined as a loss of wage earning capacity. Russellv. Lowe's Product Distribution, 108 N.C. App. 762, 425 S.E.2d 454
(1993). Plaintiff can satisfy her burden of proving disability in one of four ways: (1) the production of medical evidence that she is physically or mentally, as a consequence of the work related injury, incapable of working in any employment; (2) the production of evidence that she is capable of some work, but that she has, after reasonable effort on her part, been unsuccessful in her effort to obtain employment; (3) the production of evidence that she is capable of some work but that it would be futile because of pre-existing conditions, i.e., age, inexperience, lack of education, to seek other employment; or (4) the production of evidence that she has obtained other employment at a wage less than she earned prior to her injury. Id.
4. In the instant, case the medical evidence shows that as of October 23, 2001, plaintiff was taken out of work due to her left arm lymphedema and has not been released to work in any capacity since then. Therefore, as a result of the compensable injury, plaintiff is disabled from any employment and is entitled to temporary total disability compensation at the rate of $620.00 per week beginning October 23, 2001, and continuing until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
5. Plaintiff is entitled to have defendants pay for medical expenses incurred or to be incurred as a result of the compensable injury that provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. §§ 97-2(19); 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission reverses the holding of the Deputy Commissioner and enters the following:
 AWARD
1. Subject to a reasonable attorney's fee approved below, defendants shall pay temporary total disability compensation to plaintiff at the rate of $620.00 per week for the period beginning October 23, 2001, and continuing until plaintiff returns to work or until further Order of the Commission. Any accrued compensation shall be paid in a lump sum.
2. Defendants shall pay medical expenses incurred as a result of the compensable injury by accident when bills for the same have been approved, in accordance with the provisions of the Act.
3. A reasonable attorney's fee of 25% of the compensation awarded to plaintiff in Paragraph 1 above is hereby approved for counsel for plaintiff. From the compensation having accrued, this fee shall be deducted from the amounts due plaintiff and paid directly to plaintiff's counsel, with counsel for plaintiff receiving every fourth check thereafter.
4. Defendants shall pay the costs, including expert witness fees of $350.00 to Dr. Paschal and $300.00 to Mr. Moore, if not already paid. An expert witness fee of $300.00 is approved for Dr. Currin and shall be paid by defendants.
This 30th day of September, 2005.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER